UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL HAMMONDS,<br><br>         Plaintiff,<br><br>     v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>         Defendant. | No. 1:19-cv-01139-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF THE COMMISSIONER OF SOCIAL SECURITY AND AGAINST PLAINTIFF** |

**I.      Introduction**

Plaintiff Michael Hammonds ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for supplemental security income pursuant to Title XVI of the Social Security Act.  The matter is before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 19, 20 and 21.  After reviewing the record, the Court finds that substantial evidence and applicable law support the ALJ's decision. Accordingly, Plaintiff's appeal is denied.

**II.      Procedural Background**

On March 4, 2015 Plaintiff filed an application for supplemental security income alleging disability beginning February 24, 1994.  AR 164–69.  Plaintiff claimed disability due to emphysema, asthma, pain associated with 17 screws, bolts, and rods inserted in his right leg, bullets present in his lower body, arthritis, post-traumatic stress disorder, depression, and anti-social behavior.  AR 164–69, 187.  The Commissioner denied the application initially on November 2, 2015 and on reconsideration on August 9, 2016.  AR 104–07; 110–12.

Plaintiff requested a hearing on October 10, 2016.  AR 16.  Administrative Law Judge Joyce

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 9 and 10.

1

Frost-Wolf (the "ALJ") presided over an administrative hearing on December 13, 2017. AR 16. Plaintiff appeared without the assistance of counsel or other representative. AR 16. On August 20, 2018, the ALJ issued a decision denying Plaintiff's application. AR 16–28.

The Appeals Council denied review on June 21, 2019. AR 1–3. On August 26, 2019, Plaintiff filed a complaint in this Court. Doc. 1.

### III. Factual Background

#### A. Plaintiff's Testimony

##### 1. Agency Hearing

Plaintiff testified as follows at the administrative hearing on December 13, 2017. Plaintiff (born May 16, 1971) lived with his wife, grandson and daughter in a two-story apartment which required the use of stairs. AR 48–49. Plaintiff's highest level of education was the 7th grade. AR 49. Plaintiff had not worked in the previous 15 years. AR 50. Plaintiff suffered from emphysema, asthma, depression, chronic pain in his right leg, 17 screws, a rod, several bullets, debris, fragments and gunshot wounds in his right leg. AR 50–51. Plaintiff had an inhaler for his breathing conditions. AR 51. He used the inhaler two to three times daily. AR 51. He also had a nebulizer which he used once or twice a day. AR 52. His breathing conditions were affected by exertion, environmental factors like pollen and allergies, the weather, or cologne. AR 52.

Plaintiff took Norco, Soma, Tylenol 3, baclofen, Icy Hot Patch, Tiger Balm and lidocaine patch for pain. AR 52–53. He took hydroxyzine for his depression. AR 52. He experienced no side effects from the medication. AR 52. The medication provided some pain relief. AR 53. Activity made pain worse, including walking up stairs, sitting for too long, lifting, or any level of exertion. AR 54. He periodically went out on his apartment balcony with his grandchild, but he used the stairs to and from his apartment as little as possible, perhaps once or twice a week. AR 54. His cooking activities were limited to using the microwave or making sandwiches because he might forget the stove or oven were on. AR 54. His chores around the home were limited to picking up after himself. AR 54–55. He chose not to be around a lot of people because he had trust issues. AR 55. He went to the grocery store occasionally if it was a nice day. AR 55–56. During the month prior to the hearing he left the house about half a dozen times. AR 56. He did

not spend time with individuals besides family outside the home. AR 56. He was on the waiting list for therapy for depression. AR 57.

His physical therapy helped sometimes but other times made him uncomfortable. AR 57. During the year preceding the hearing, he went to the emergency room once for his breathing because he may have caught a virus. AR 57. He described his condition as chronic, noting that it was not improving and that he thought it was getting worse. AR 58. He had been using a cane for four years. AR 58. The cane helped him stay stable when he had to go certain distances because his legs gave out on him sometimes. AR 58. He fell previously, including on one occasion a few months prior to the hearing. AR 58. The fall resulted in him needing crutches for a while thereafter. AR 58.

### 2. Function Report

Plaintiff provided additional statements in a July 21, 2018 function report in which he noted daily leg spasms, worsening breathing condition, rarely leaving his home, social isolation, depression non-responsive to medication, and medication side effects of nausea, mood swings, forgetfulness and dizziness. AR 203–10. He estimated he could walk one-half black before needing to rest for 10-15 minutes, depending on the weather. AR 208. He reported poor ability to follow written or spoken instructions, interact with authority, or handle changes in routine. AR 208–09.[2]

### B.     Medical Records

Plaintiff suffered eleven gunshot wounds in his left leg in 1994, resulting in a reconstructed right hip and thigh bone, residual bullet fragments and shrapnel, muscle spasms in both legs, and chronic pain. AR 301, 304, 306–07. In May 2013 he reported to his physician with leg pain uncontrolled by pain medication (baclofen), though a physical examination found a normal range of motion in his upper and lower extremities with no swelling, erythema or joint deformities. AR 302. Plaintiff was prescribed hydrocodone and Neurontin. AR 303. A May 2013 x-ray revealed bullet fragments in both femurs with no acute fractures in the right or left femur, and no dislocation

---

[2] Plaintiff's mother completed a third-party function report on June 11, 2016, the content of which has not been placed in issue by either party. AR 246–253.

or other osseous abnormality in the left femur, which was otherwise unremarkable. AR 306–07. Plaintiff reported to an emergency room on June 27, 2014 with leg pain and received Norco and Xanax. AR 301. Thereafter Plaintiff reported to a physician, PA-C Abernathy, on August 1, 2014, reporting constant sharp and progressive pain as well as bilateral muscle spasms in his legs. AR 301. An examination revealed full range of motion in his spine and limited range of leg motion with ability to tandem walk but inability to heel walk. AR 301–02 . His diagnosis was chronic post-operative pain and anxiety. AR 302. He was referred for follow up orthopedic pain management and prescribed Flexeril and Neurontin for pain and Vistaril for anxiety. AR 302.

In May 2014 he sought mental health treatment, reporting concentration and decision-making difficulties, mood swings, trust issues, appetite issues, weight loss, suicidal ideation, excessive sleep patterns, nightmares, flash backs, fear of crowds, social isolation, and difficulty handling household tasks. AR 345–47. He was diagnosed with post-traumatic stress disorder and major depressive disorder, recurrent, severe. AR 342. Upon a psychiatric follow-up in October 2014, his diagnoses were maintained. AR 334. Plaintiff sought follow-up treatment in March 2015 after his son was shot and killed in October 2014. AR 330. He reported that his medications were helping but made him sleepy, and he wanted to switch to valium. AR 330. An examination revealed chronic pain, steady gain, and anxious and depressed mood. AR 331.

On some occasions Plaintiff reported constant pain at an intensity level 9 out of 10. *See, e.g.*, AR 444, 448. On other occasions he reported intermittent, moderate pain that was fairly controlled or partially alleviated by medication. *See, e.g.*, AR 381, 403. Plaintiff was prescribed a cane and bilateral knee braces in December 2016. AR 395. In February 2017 Plaintiff reported pain level 9 out of 10. AR 398. Plaintiff reported to the emergency room in February 2017 because of leg pain and difficulty breathing. AR 421. Corresponding records reported a "mildly antalgic gait." AR 422. He was diagnosed with chronic pain. AR 422. In April 2017 Plaintiff rated his pain a 4 out of 10. AR 400.

Plaintiff experienced a fall in July 2017 necessitating a trip to the emergency room. AR 425. The physical examination revealed normal extremity range of motion, no tenderness, and a normal gait. AR 426. Femur and pelvis x-rays were negative for new fractures or dislocations.

AR 426, 431–32, 452–55. Plaintiff was prescribed pain medication and adhesive patches. AR 426. The next day, following an unsuccessful attempt to obtain his prescription while uninsured, Plaintiff returned to the emergency room with continued pain, the examination noted tenderness and mild knee effusion. AR 429. He was prescribed an immobilizer brace, crutches and Hydrocodone. AR 430.

After his fall, an August 2017 follow-up visit and physical examination revealed diffuse tenderness and traumatic scarring of the right lower extremity. AR 439. He was referred for a new pain management regimen and physical therapy. AR 446. At Plaintiff's physical therapy evaluation on October 25, 2017, he reported pre-treatment pain level 9 out of 10. AR 460. He reported pain when performing the physical therapy exercises and adjustments were made. AR 460.

At Plaintiff's initial pain management consultation on October 27, 2017, he explained that his pain intensity was 4 out of 10 with medication, 9 out of 10 without medication, that his pain medication provided relief for 1 to 2 hours at a time, and that his pain was alleviated by heat, massage, medications, change of position and rest. AR 516. A physical examination found abnormal range of motion in Plaintiff's spine. AR 518. Plaintiff was diagnosed with lumbar radiculopathy and admitted for long-term opiate analgesic. AR 518. During a November 2017 office visit, Plaintiff reported worsening pain with rainy weather, pain level 8 out of 10, worsening sleep quality, and sleeping only four hours a night. AR 512.

A December 2017 examination noted no pain upon range of motion testing, normal gait, and normal lumbar range of motion. AR 509. Two physical examinations in January 2018 examination found normal gait, bilateral hip tenderness, and abnormal range of motion in the lumbar spine. AR 497–98; 504.

### C. Medical Opinions

#### 1. Agency Examinations

On September 16, 2015, consultative examiner Dr. Peter Ciali, Ph.D., conducted a psychological examination of Plaintiff. AR 357–60. Dr. Ciali noted that Plaintiff ambulated slowly with a single point cane. AR 357. Dr. Ciali reported that Plaintiff displayed fair eye contact, no

visual or hearing problems, difficulty with sustained attention and concentration, emotional distress, linear thought process, situationally appropriate thought content, fair recent and remote memory, no perceptual disturbances or delusions, no suicidal or homicidal ideations, sad and tearful affect, fair insight into his problems, intact judgment, and was forthright in providing information. AR 357. Dr. Ciali administered the Montreal Cognitive Assessment (MoCA[3]), Plaintiff scored 18/30, below the normal level of 26 and above. AR 359. Plaintiff's diagnoses were: PTSD, major depressive disorder, recurrent moderate, r/o antisocial personality disorder. AR 360. Dr. Ciali's prognosis and recommendations were as follows: capable of independently managing his own funds; guarded prognosis for improvement; significantly impaired ability to perform work related mental activities including remembering information, understanding instructions, and maintaining sustained concentration; significant deficits in ability to socially interact and adapt. AR 360.

On September 26, 2015, consultative examiner Abrar Adil, D.O., conducted a physical examination of Plaintiff. AR 362–69. Dr. Adil noted that Plaintiff moved about the exam room easily, had full range of motion in his spine, exhibited normal bilateral toe and heel walking, and "palpable deep subcutaneous retained firm foreign body to left proximal anterior thigh consistent with history of retained [gunshot wound]." AR 363. Dr. Adil noted that Plaintiff ambulated with a steady gate at an appropriate speed without assistive devices. AR 363. Dr. Adil's assessment was as follows: bilateral leg pain and irritation from hardware and retained extra-articular foreign body/retained bullet fragments, emphysema, asthma, PTSD, depression, status post-multiple gunshot wounds, and past tobacco use. AR 363. Dr. Adil did not opine on Plaintiff's functional capacity or prognosis.

## 2. Agency Medical Consultants

On September 29, 2015, state agency medical consultant Karl K. Boatman, M.D., reviewed Plaintiff's medical records and opined that Plaintiff's physical residual functional capacity was limited to light work, occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand, walk and sit for 6 hours on a sustained basis, push or pull on an unlimited basis, occasional climbing,

---

[3] MoCA is a brief 30-question test which assesses different types of cognitive abilities, including orientation, short term memory executive function, language abilities and visuospatial ability.

balancing, stopping, kneeling, crouching or crawling, with no manipulative, visual or communicative limitations. AR 75–77. Dr. Boatman opined that Plaintiff had some environmental limitations due to his asthma, namely avoiding concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards. AR 77. On reconsideration on July 28, 2016, Dr. Donald Baldwin, M.D., a State agency medical consultant, reviewed the updated medical record and opined that Plaintiff could perform work at all exertional levels. AR 94–96. Dr. Baldwin expressed the same environmental limitations as Dr. Boatman expressed, namely the need to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other respiratory irritants. AR 94–96.

On October 30, 2015, state agency medical consultant Dr. Carolyn Goodrich, PhD, reviewed Plaintiff's medical records and opined on Plaintiff's mental residual functional capacity, noting moderate restriction of daily activities, moderate difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence and pace, and no repeated episodes of decompensation of extended duration. AR 74. Dr. Goodrich opined that Plaintiff had marked limitations remembering and carrying out detailed instructions, and marked difficulty interacting appropriately with the general public. AR 78–79. She further opined that Plaintiff can understand and perform simple tasks under routine supervision, can interact appropriately with others at a superficial level (but not the general public) and can adapt to a work situation. AR 79–80. On reconsideration on July 26, 2016, state agency psychological consultant Laura Lochner, PhD opined as to Plaintiff's mental residual functional capacity, expressing the same limitations that Dr. Goodrich expressed. AR 96–98.

### D. **Vocational Expert**

Vocational expert Paul Steven Ramirez testified at the administrative hearing on December 13, 2017. Mr. Ramirez opined that there are jobs available in the national economy for an individual of claimant's age, education and work history with no exertional limitations who could have only occasional exposure to respiratory irritants, perform simple, routine tasks, have only occasional contact with coworkers and supervisors, and have no public contact. AR 61. Specifically, available jobs would include: packer, hand; laborer, stores; and cleaner, housekeeper. AR 61. For an individual with Plaintiff's background and an exertional limitation of light work,

the following jobs would be available: cannery worker; assembler, small products. AR 62. Finally, if a condition was added that the individual had to take two additional breaks during the workday, up to 10 minutes each, no jobs would be available. AR 62.

## IV.     Standard of Review, Generally

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.     The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate

8

> area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI.     The ALJ's Decision

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of March 1, 2015. AR 18. The ALJ found that Plaintiff's severe impairments were as follows: right femur status post injuries, fixation, and anxiety disorder. AR 18. The ALJ found Plaintiff's breathing conditions, lumbar pain, PTSD and depression non-severe. AR 18–19. The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926). AR 19.

The ALJ concluded that Plaintiff had the residual functional capacity to perform medium work as defined in 20 C.F.R. §§ 416.967(c), except that he could have only occasional exposure to respiratory irritants, could perform simple routine tasks, and could have no public contact. AR 20.

Plaintiff had no past relevant work. AR 26. The ALJ found that considering Plaintiff's age, education, work experience and residual functional capacity, jobs existed in the national economy in significant numbers that Plaintiff could perform. AR 26. Accordingly, the ALJ concluded that

Plaintiff was not disabled as defined in the Act.  AR 27.

### VII. Reliability of Plaintiff's Testimony

Plaintiff's overarching contention is that the ALJ "erred by rejecting Plaintiff's testimony without a clear and convincing reason based on substantial evidence." Br. at 20, Doc. 19.

#### A. Applicable Law

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). His or her findings of fact must be supported by "clear and convincing evidence." *Burrell v. Colvin*, 775 F.3d 1133, 1136–37 (9th Cir. 2014).

To determine whether the ALJ's findings are supported by sufficient evidence, a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989). "[A] federal court's review of Social Security determinations is quite limited." *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015). "For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014), quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966)) (internal quotation marks omitted). Federal courts should generally "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.'" *Brown-Hunter*, 806 F.3d at 492 (quoting *Treichler*, 775 F.3d at 1098).

Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016. Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor

to "determine how symptoms limit ability to perform work-related activities." S.S.R. 16-3p at 1-2.

A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p. "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82.

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2. "[S]ome individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence and the same non-medical evidence." S.S.R. 16-3p at 5. In reaching a conclusion, the ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and, any other relevant evidence included in the individual's administrative record. S.S.R. 16-3p at 5. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the

individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." S.S.R. 16-3p at *10.

Because a "claimant's subjective statements may tell of greater limitations than can medical evidence alone," an "ALJ may not reject the claimant's statements regarding her limitations merely because they are not supported by objective evidence." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147–48 (2001) (quoting *Fair*, 885 F.2d at 602). *See also Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (holding that when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely because they are unsupported by medical evidence). "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability." *Id.* (internal quotation marks and citations omitted).

The law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony. "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)). As part of his or her analysis of the record as a whole, an ALJ properly considers whether the objective medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence"). "[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities." S.S.R. 16-3p at 6. Because objective medical evidence

may reveal the intensity, persistence and limiting effects of a claimant's symptoms, an ALJ must consider whether the symptoms reported by a claimant are consistent with medical signs and laboratory findings of record. *Id.* For example, "reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, pain." *Id.*

### B. Analysis

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. AR 21. The ALJ found no malingering. AR 21. Thus, the ALJ was required to articulate clear and convincing reasons before rejecting Plaintiff's testimony. *Laborin v. Berryhill*, 867 F.3d 1151, 1155 (9th Cir. 2017).

Following Plaintiff's thorough 21-page recitation of fact and law, Plaintiff's analysis consists of only three short points with minimal accompanying elaboration. The Court will address each one in turn.

### 1. Limited Mobility

First, Plaintiff takes issue with the ALJ's opinion for stating that "nothing in the record" indicates Plaintiff's right femur problem "severely reduced" his mobility, while ignoring contrary medical evidence in the record. Br. at 22 (citing AR 24–25).

Before addressing the sub-components of this argument it is worth noting that it has little to do with Plaintiff's overarching challenge to the ALJ's decision, namely that ALJ "erred by rejecting Plaintiff's testimony . . ." Br. at 20. Plaintiff does not identify which statements from his testimony support the conclusion that his right femur impairment severely reduces his overall mobility. His testimony, on balance, does not support that conclusion. Although he testified that exertion exacerbated his leg pain, that he had been using a cane for four years, and that he had experienced a fall (AR 54, 58), he also testified that he periodically takes his grandchild on the

balcony, uses the stairs to his apartment once or twice a week, goes to the store when the weather is nice, left his home half a dozen times the previous month, and experienced some pain relief from medication. AR 53–56. If Plaintiff's position is that he testified that his femur pain has advanced to the point where his mobility is severely reduced, he does not make that position clear in his brief.

Moreover, the ALJ did not reject Plaintiff's testimony outright. Rather, the ALJ compared certain of Plaintiff's statements with other statements, and the ALJ also compared Plaintiff's statements with the content of the medical records:

> The claimant claims he has difficulty lifting, sitting, standing and walking for extended periods due to pain and breathing problems and he uses [a] cane or use[s] crutches to ambulate and prevent falls . . . However, the medical evidence shows that he has normal motor strength, normal range of motion in his joints and stable gate without the use of assistance devices . . . *Moreover, he testified that he uses the stairs to get to his apartment on the second floor and his current medications provide relief.*

AR 25 (emphasis added). Thus, it is not correct for Plaintiff to contend that the ALJ simply "rejected" his testimony outright. Rather, the ALJ considered the extent to which the medical evidence and Plaintiff's testimony as a whole supported the notion that Plaintiff's mobility was significantly limited. If, as Plaintiff contends, the ALJ did reject part of his testimony, the ALJ's decision to do so was based on clear and convincing evidence, namely other portions of Plaintiff's own testimony and innumerable pieces of objective medical evidence. *See* S.S.R. 16-3p at 5 (explaining that an ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."). Here, the ALJ did exactly that, as explained below.

Turning now to the specifics of Plaintiff's argument (specifics which, again, have nothing to do with the content of his testimony), Plaintiff argues that "the ALJ failed to address probative

evidence in the medical record that contradicts her conclusions." Br. at 22. An ALJ "need not discuss all evidence presented to her. Rather, she must explain why significant probative evidence has been rejected . . . An ALJ must explain why he has rejected uncontroverted medical evidence." *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984).

Specifically, Plaintiff contends that "the ALJ did not address the portions of the medical record which reflect Plaintiff's physicians prescribed Mr. Hammond a cane due to his reduced mobility," (Br. at 22, citing AR 345, 357, 426), "[n]or did the ALJ address Emergency Room records pertaining to Mr. Hammonds' fall in July 2017 resulting in a brace and crutches," (Br. at 22, citing AR 425–30) "[n]or clinical findings of restricted range of motion in Plaintiff's lower back with pain upon range of motion testing." (Br. at 22, citing AR 446, 450, 504, 518).

Although the ALJ did not cite each record Plaintiff cited, the ALJ properly discussed numerous records touching on the same topics. For example, the ALJ cited others: *See, e.g.*, AR 22 ("He requested a cane and bilateral knee braces to assist with ambulation . . . He was given a referral for DME (for cane and bilateral knee braces) . . ."). Similarly, although the ALJ did not refer to Plaintiff's July 24, 2017 emergency visit as an "emergency" visit, she did discuss X-Rays conducted during said visit and X-Rays conducted the following day. *See* AR 22. Similarly, although the ALJ did not cite each record Plaintiff cites regarding lumbar range of motion, she did discuss others. *See, e.g.*, AR 23 ("Physical examinations . . . were all essentially within normal limits with the exception of pain with hip range of motion . . . *decreased lumbar spine range of motion* . . . Objective findings on clinical examination were otherwise generally within normal limits, including . . . *normal range of motion of the lumbar spine* . . .") (emphasis added). Thus, the ALJ did consider the objective medical evidence of Plaintiff's cane use, his emergency department visit, and his lower back range of motion in reaching a conclusion about his mobility. Thus, Plaintiff's contention that the ALJ ignored the objective medical evidence on these topics is

not altogether correct.

Moreover, the ALJ's alleged failure to specifically cite and discuss every medical record cited by Plaintiff regarding cane use and lower back range of motion does not undermine her decision because those records are not uncontroverted. *See Vincent*, 739 F.2d at 1395 ("An ALJ must explain why he has rejected uncontroverted medical evidence."). As to Plaintiff's cane use, even substantially contemporaneous records reveal different findings. For example, on September 16, 2015, consultative examiner Dr. Peter Ciali reported that Plaintiff "ambulated slowly with a single point cane," (AR 357), whereas 10 days later on September 26, 2015, consultative examiner Dr. Abrar Adil noted that Plaintiff "ambulate[d] with a steady gate at an appropriate speed without use of assistive devices." AR 363. Similarly, whereas physical examinations dated October 2017 and January 2018 found limited, painful and/or abnormal range of motion in Plaintiff's low back (AR 518, 499, 504), physical examinations dated August 2014, September 2015 and December 2017 found normal and/or painless range of motion (AR 302, 363, 509).[4]

The ALJ considered the relevant objective medical evidence concerning Plaintiff's mobility, some of which supports and some of which contradicts her conclusion. Given the variety of testimonial and medical evidence on both sides of the issue, the ALJ's conclusion that Plaintiff's mobility is not several reduced is supported by substantial evidence. *See Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (noting that, if the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must

---

[4] It is worth noting that these variations are not unique but are emblematic of the administrative record more generally. For example, on some occasions Plaintiff reported sleeping too much (AR 346), whereas other times he reported sleeping too little (AR 512). On some occasions Plaintiff reported constant pain at an intensity level 9 out of 10 (AR 444, 448), whereas on other occasions he reported intermittent, moderate pain that was fairly controlled or partially alleviated by medication (AR 381, 403). In February 2017 Plaintiff rated his pain a 9 out of 10 (AR 398), whereas two months later he rated his pain a 4 out of 10 (AR 400). At Plaintiff's initial physical therapy evaluation in October 2017 he reported a pain level of 9 out of 10 (AR 460), whereas days later he rated his pain a 4 out of 10 with medication and a 9 out of 10 without medication (AR 516). A July 2017 physical examination noted no tenderness in his back or extremities upon range of motion testing (AR 426), whereas an examination the following day noted tenderness and swelling (AR 429).

affirm the decision.).

## 2. **Conservative Treatment**

Plaintiff's second argument is somewhat difficult to parse, but consists of the following assertions: 1) a claimant cannot be discredited for failing to pursue non-conservative treatment options where none exist; 2) here, Plaintiff was receiving narcotic medication for pain associated with his gunshot wounds . . .; 3) the ALJ states that Plaintiff's treatment has been conservative in nature, but does not address any more aggressive treatment options that could have been provided to Plaintiff; and 4) substantial evidence does not support the ALJ's finding that Plaintiff has only received conservative treatment for his pain. AR 23.

It is not clear whether Plaintiff is arguing 1) that Plaintiff appropriately declined to pursue non-conservative treatment options because none existed, or 2) that the ALJ overlooked the fact that Plaintiff's course of narcotic medication was itself a non-conservative treatment option. In any event, it seems Plaintiff's broader position is that his alleged failure to pursue non-conservative treatment options is not a legitimate basis for the ALJ to discredit Plaintiff's testimony about his pain.

Plaintiff's argument here seems undeveloped. It does not appear that the ALJ made a finding that Plaintiff should have pursued non-conservative treatment options, nor discredited Plaintiff's testimony on that basis. Rather, after observing that the "claimant's statements concerning the intensity, persistence and limiting effects of his symptoms are not fully supported by the objective medical evidence and other relevant documented evidence . . ." the ALJ made some general observations about the evidence before delving into the specifics. The second such observation was that "the claimant's treatment has been conservative in nature." AR 24. The ALJ's broad characterization of his treatment as "conservative," without elaboration, neither adds to nor detracts from her opinion. *See Tommasetti*, 533 F.3d at 1038 (noting that alleged errors are not

reversible when it is apparent that they are "inconsequential to the ultimate nondisability determination."). That statement does not undermine the litany of independent evidence (medical and non-medical) the ALJ identified in support of her conclusion about Plaintiff's functional limitations.

### 3. **Daily Activities**

Finally, Plaintiff takes issue with the ALJ's statement that "[d]espite his subjective symptoms and difficulties, the claimant is able to take care of his personal hygiene and grooming, prepare simple meals, shop in stores, pay bills, count change, use public transportation, ride in cars with others, attend church on Sunday." Br. at 24 (citing AR 25). Plaintiff relies on *Orn* and *Molina*, noting that daily activities can only form the basis for an adverse credibility determination when the activities contradict the claimant's other testimony or where the activities demonstrate transferable work skills. Br. at 24 (citing *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007); *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012), *superseded by regulation on other grounds*).

In *Orn*, the ALJ rejected the plaintiff's testimony because his daily activities of "read[ing], watch[ing] television and color[ing] in coloring books" "indicate that he is more functional than alleged." *Orn*, 495 F.3d at 639. The Ninth Circuit found that the ALJ improperly rejected the plaintiff's testimony on that basis because the daily activities described did not contradict the plaintiff's other testimony, nor did those activities meet the threshold for transferable work skills. *Id.* The Ninth Circuit found that they were "activities that are so undemanding that they cannot be said to bear a meaningful relationship to the activities of the workplace." *Id.* Simply put, the daily activities Plaintiff engaged in here, as described by the ALJ and quoted above, are quite distinct from reading, watching TV, and coloring. Thus *Orn* has no factually applicability here.

The activities Plaintiff engaged in here are closer to the facts of *Molina*, where the Ninth Circuit found that the ALJ properly concluded that the plaintiff's alleged social limitations were

inconsistent with her daily activities of "walking her grandchildren to and from school, attending church, shopping, and taking walks," activities which the court found were transferable to a work setting. *See Molina*, 674 F.3d at 1113. Plaintiff offers no reason why this Court should reach a different conclusion here.

Finally, Plaintiff relies on *Burch*, in which the Ninth Circuit stated that "if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making *specific findings* relating to those activities." *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (emphasis added by Plaintiff). Plaintiff contends that the "the ALJ did not make any specific findings how or whether [his daily] activities transfer to a work setting." Br. at 24. Indeed, the ALJ did not offer such an explanation. However, the "specific findings" requirement Plaintiff underscores do not appear to be as demanding as Plaintiff suggests. In *Burch*, the only "specific findings" the ALJ made regarding the plaintiff's daily activities were that those activities "suggest that she is quite functional. She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and her boyfriend. She is able to manage her own finances and those of her nephew." *Burch*, 400 F.3d at 681. The ALJ in *Burch* did not explain how those activities transfered to a work setting, yet the Ninth Circuit nevertheless affirmed the ALJ's decision. *Id.* Similarly here, the ALJ's reasoning is not undermined by her lack of an explanation as to how Plaintiff's daily activities transfer to a work setting.

Plaintiff offers no reason why this Court should reach a different conclusion than the *Burch* court reached on comparable facts. Notably, the impairments at issue in *Burch* were quite similar to those at issue here, including asthma, back pain, weakness and depression (albeit in addition to breast cancer). *Id.* The plaintiff's daily activities described in *Burch* were also substantially similar to those Plaintiff engaged in here. *Id.* And, much like in *Burch*, "although the evidence of

[Plaintiff's] daily activities may also admit of an interpretation more favorable to [Plaintiff]," the ALJ's interpretation here was rational. *Id.* Moreover, the ALJ's decision was supported by other substantial evidence in the record including Plaintiff's medical history as described above, not just his daily activities. *See Burch*, 400 F.3d at 680–81 ("Contrary to Burch's argument, the ALJ did not solely rely on the minimal objective evidence and Burch's daily activities in discrediting her testimony . . . the ALJ also considered the objective medical findings in discounting Burch's testimony."). The ALJ's findings regarding Plaintiff's daily activities do not undermine her conclusions regarding his functional limitations, which were supported by substantial evidence.

## VIII. Conclusion and Order

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is denied. The Clerk of Court is directed to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Michael Hammonds.

IT IS SO ORDERED.

Dated:   **October 14, 2020**                    **/s/ Gary S. Austin**
                                                 UNITED STATES MAGISTRATE JUDGE